**Felice M. GELMAN, Treasurer, Citizens for LaRouche, Citizens for LaRouche, Inc., the Principal Campaign Committee of Lyndon H. LaRouche, Petitioners,**

v.

**FEDERAL ELECTION COMMISSION, Respondent.**

**No. 80–1646.**

United States Court of Appeals, District of Columbia Circuit.

Argued July 14, 1980.

Decided July 18, 1980.

James F. Schoener, Washington, D. C., for petitioners.

Kathleen Imig Perkins, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C., with whom Charles N. Steele, Gen. Counsel, Marsha G. Gentner, Atty., Federal Election Commission, Washington, D. C., were on brief, for respondent.

Before WRIGHT, Chief Judge, and WILKEY and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Lyndon LaRouche is a candidate for the Democratic Party's nomination for President of the United States. Petitioners are Citizens for LaRouche, Inc., Mr. LaRouche's principal campaign committee, and Felice M. Gelman, treasurer of Citizens for LaRouche. Pursuant to the provisions of the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1976), Mr. LaRouche lost his eligibility for federal matching funds because of his failure to obtain a sufficient number of votes in two successive primary elections that he entered. The statute provides, however, that a candidate may reestablish his eligibility in a subsequent primary election. Petitioners contend that Mr. LaRouche satisfied the prerequisites of the statute by garnering at least 20 percent of the vote on the Democratic side in the Michigan primary in May of this year. They contest the Federal Election Commission's (FEC or the Commission) denial of their request to resume payment of matching funds. For the reasons that follow, we affirm the Commission's determination that Mr. LaRouche has failed to reestablish his eligibility to receive federal matching funds.

## I. BACKGROUND

### A. The Statute

The Presidential Primary Matching Payment Account Act (the Act) was enacted in 1974[1] and authorizes the creation of the Presidential Primary Matching Payment Account, 26 U.S.C. § 9037(a) (1976). Every eligible candidate for the presidential nomination of his or her party is entitled under the Act to receive from the account funds matching every contribution to the candidate's campaign, up to $250 per contribution.[2] To become eligible to receive matching funds, a candidate must agree to maintain records of campaign expenses and contributions and to cooperate with the FEC's audits and examinations.[3] A candidate must also demonstrate that his candidacy enjoys at least a modicum of public support by collecting "matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 States," 26 U.S.C. § 9033(b)(3) (1976). Qualifying contributions may not exceed $250, id. § 9033(b)(4).

Congress amended the Act in 1976[4] to provide that matching payments are to be terminated for any candidate who ceases to campaign actively in more than one state, 26 U.S.C. § 9033(c)(1)(A) (1976), or whose performance at the polls indicates that his candidacy no longer enjoys even minimal public support. The absence of public support is established by the candidate's failure to receive 10 percent or more "of the number of votes cast for all candidates of the same party for the same office," id. § 9033(c)(1)(B). The 1976 amendments also provide, however, that any such candidate can reestablish his eligibility to receive matching funds by demonstrating, again through his performance at the polls, that his candidacy enjoys some minimal level of public support:

(1) agree to obtain and furnish to the Commission any evidence it may request of qualified campaign expenses,
(2) agree to keep and furnish to the Commission any records, books, and other information it may request, and
(3) agree to an audit and examination by the Commission under section 9038 and to pay any amounts required to be paid under such section.

---

1. Pub.L.No.93–443, § 408(c), 88 Stat. 1297 (1974).

2. 26 U.S.C. § 9034(a) (1976). The federal payment will match gifts received by the campaign "on or after the beginning of the calendar year immediately preceding the calendar year of the presidential election with respect to which such candidate is seeking nomination." Id.

3. 26 U.S.C. § 9033(a) (1976) provides:
   (a) Conditions
   To be eligible to receive payments under section 9037, a candidate shall, in writing–

4. Pub.L.No. 94–283, § 306, 90 Stat. 499 (1976).

(4) Reestablishment of eligibility

.   .   .   .   .

(B) Notwithstanding the provisions of paragraph (1)(B), a candidate whose payments have been terminated under paragraph (1)(B) may again receive payments (including amounts he would have received but for paragraph (1)(B)) if he receives 20 percent or more of the total number of votes cast for candidates of the same party in a primary election held after the date on which the election was held which was the basis for terminating payments to him.

26 U.S.C. § 9033(c)(4)(B) (1976).

## B. *The Commission's Decision*

On December 18, 1979, the FEC certified that Mr. LaRouche was eligible to receive matching fund payments under the Act.[5] Mr. LaRouche thereafter received less than 10 percent of the total votes cast for candidates for the Democratic presidential nomination in two consecutive primaries: in New Hampshire on February 26, 1980, and in Illinois on March 18, 1980. The FEC accordingly notified him that it would terminate matching payments for campaign expenditures incurred after April 17, 1980.[6]

On May 20, 1980, the state of Michigan held its presidential primary. The ballot listed two candidates for the Democratic nomination: Governor Edmund G. Brown, Jr. and Lyndon LaRouche.[7] In addition, the ballot permitted a vote to be cast for "Uncommitted" and provided a space for the name of a write–in candidate.[8] The results of the voting on the Democratic side were as follows:

| | |
|---|---|
| Brown | 23,043 |
| LaRouche | 8,948 |
| Uncommitted | 36,385 |
| Write–ins | 10,048 |

Of total votes cast (78,424), the percentage distribution was as follows:

| | |
|---|---|
| Brown | 29.4% |
| LaRouche | 11.4% |
| Uncommitted | 46.4% |
| Write–ins | 12.8% |

On the basis of the results in the Michigan primary, Mr. LaRouche requested that the FEC resume payment of matching funds. He reasoned that the Act requires that a candidate receive 20 percent of the "votes cast for *candidates* of the same party in a primary election," and that the votes cast for Governor Brown (who ceased to be an active candidate on April 1, 1980) and for "Uncommitted" should therefore not be included in determining whether he had satisfied the 20 percent requirement for reestablishing eligibility. If the votes cast for Governor Brown and for "Uncommitted" are not taken into account, the Democratic votes in the Michigan primary total 18,996, with 47.1 percent for LaRouche and 52.9 percent for various write–in candidates; if the votes cast for Governor Brown (but not for "Uncommitted") are included

---

**5.** Petitioners' Appendix (PA) 1.

**6.** PA 2–3. 26 U.S.C. § 9033(c)(1) provides in relevant part that

no payment shall be made to any individual under section 9037–

.   .   .   .   .

(B) more than 30 days after the date of the second consecutive primary election in which such individual receives less than 10 percent of the number of votes cast for all candidates of the same party for the same office in such primary election.

**7.** The Michigan Democratic Party did not participate in the Michigan primary election, and, at the state party's request, both President Carter and Senator Kennedy withdrew from the primary. Respondent's Brief at 8, app. 5a. The withdrawals were the result of a conflict between Michigan state election laws, which required an "open" primary in which any registered voter could vote on either the Democratic or Republican side of the ballot, *see Ferency v. Austin,* 493 F.Supp. 683, 686 (W.D.Mich. 1980), *reprinted in* PA 31, 32; Respondent's brief at 8, and the delegate selection rules of the Democratic National Committee, which limit "[p]articipation in the delegate selection process in primaries or caucuses .  .  . to Democratic voters only who publicly declare their party preference and have that preference publicly recorded," *Delegate Selection Rules of the 1980 Democratic National Convention* ¶ 2, at 3 (June 1978); Respondent's Brief at app. 9a. The state party organized a statewide caucus for the selection of delegates, a method which was expressly upheld in *Ferency.*

**8.** Petitioners' Brief at 4; Joint Appendix (JA) 6.

942

as well, the percentages are 54.8 percent for Brown, 23.9 percent for the write–ins, and 21.3 percent for LaRouche.[9]

The Commission considered Mr. LaRouche's claim at its May 29 meeting and voted unanimously, one Commissioner absent, to deny his request for matching funds.[10]

## II. DISCUSSION

This petition for review presents us with an issue of first impression—the proper interpretation of the phrase "votes cast for candidates of the same party in a primary election," as that language is used in the reestablishment of eligibility provision, 26 U.S.C. § 9033(c)(4)(B) (1976). The question to be decided is whether that phrase refers merely to votes cast for individual, active candidates or to votes cast for any and all voter preferences within a single party, including those cast for inactive candidates, for write–ins, and for "Uncommitted." We hold that the latter, more expansive reading of the phrase is consistent with the language adopted by Congress and with the apparent purpose of the 1976 amendments to the Act.

Petitioners argue that the word "candidate" must take its meaning from the Act itself, which defines "candidate" as "an individual who seeks nomination for election to be President of the United States . . . [and] who is . . . actively conducting campaigns in more than one State." 26 U.S.C. § 9032(2) (1976). Thus, petitioners assert, "votes cast for *candidates*" can only be those votes cast for *individuals* who are actively campaigning in more than one state. This interpretation would eliminate from the Michigan Democratic primary results all votes cast for Governor Brown,

who by May 20 had ceased to campaign actively in more than one state, and votes cast for "Uncommitted," because "Uncommitted" does not refer to any individual candidate.[11]

Petitioners' construction ignores the fact that the word "candidate" does not appear in the statute in a vacuum. The complete phrase to be construed and applied by the FEC is "candidates of the same party in a primary election." Petitioners' narrow focus on the word "candidate," to the exclusion of the phrase within which that word appears, results in a strained and artificial construction that is at odds with the Act's underlying concern that federal matching funds should go only to those candidates who have demonstrated at least minimal public support for their candidacies.

When the entire phrase is read as a whole, less emphasis is placed upon the word "candidate," and more emphasis is placed upon the total vote cast under one or another party heading. Congress intended by that focus to keep separate vote computations for each of the political parties. The viability of a particular candidacy can hardly be measured by including the votes cast for candidates of other political parties.

As enacted in 1974, the Act premised eligibility upon an ability to raise funds through public contributions in at least 20 states. The 1976 amendments established an equally pragmatic test for determining whether a candidate should continue to receive matching funds: his ability to capture 10 percent or more of the vote within his party in two consecutive primary elections. Similarly, reestablishment of eligibility was made to turn on voter support for the candidate. In all of these determinations, the touchstone is whether it may be said as a practical matter that the candidacy is a viable one. As Senator Taft noted, passage

---

**9.** These figures are based on the final totals as certified by Michigan's Secretary of State. *See* PA 18–26. Mr. LaRouche's request for resumption of matching funds was premised upon slightly different figures because the official results were not available at the time he made his request. *See* PA 8–9. The differences between the two sets of figures, however, do not affect either the reasoning or the outcome of this case.

**10.** JA 12–37.

**11.** Such an interpretation could conceivably eliminate some or all of the votes cast for write–in candidates, since many of such candidates might not satisfy the statutory definition on which petitioners rely.

of the 1976 amendments "express[es] the sense of the Congress that the public financing program is not to support campaigns that are going nowhere fast." 122 Cong.Rec. 7174 (1976). The measuring stick for such viability must necessarily include all of the options that voters of a particular political party in any given state can exercise. If state law allows a "no preference" or "none of the above" option, as it does in Michigan, that is just as valid a meter of a candidate's popularity as a head–to–head confrontation.

Petitioners' sterile reading of the statute ignores Congress' practical purpose and exalts literalness over common sense. Out of 78,424 votes cast on the Democratic side of the Michigan primary ballot, 88.6 percent were not cast for Mr. LaRouche. Through a narrow reading of the Act, Mr. LaRouche would have us conclude that 88.6 percent nonsupport translates into 47.1 percent support. No amount of statutory construction can reach such an illogical conclusion.

Our reading of the statute is also consonant with the FEC's past practice, which should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Kyle v. Interstate Commerce Commission*, 609 F.2d 540 (D.C.Cir.1979). At oral argument, counsel for the Commission stated that, in determining whether a candidate has satisfied the 10 percent minimum, the FEC has consistently computed the candidate's share of the total votes cast within a party designation. We note that the FEC's approach in evaluating Mr. LaRouche's request was consistent with this long–standing practice and is thus entitled to considerable deference from this court. *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *District of Columbia v. Payne*, 374 F.2d 261 (D.C.Cir.1966).

Where the agency's interpretation is supported by the language and overall purpose of the statute being construed, a reviewing court's work is greatly simplified. And where petitioner's construction leads to a conclusion that is illogical or at odds with the apparent purpose of the statute, there can be no doubt as to the correctness of the agency's position.[12]

We thus find that the Commission's interpretation of the 20 percent rule in 26 U.S.C. § 9033(c)(4)(B) (1976) is a correct and complete basis for its denial of petitioners' request. Accordingly, we do not reach the Commission's remarkable assertion that the Michigan primary election was not an "election" for the purposes of the Act.[13]

The Commission's denial of petitioners' request is

*Affirmed.*

---

**12.** It is conceivable that all of the candidates in a particular state primary could be marked for disqualification, if 90 percent or more of the voters opted for "none of the above." Given the past construction of section 9033(c)(1)(B) by the Commission, and the clear expression of Congress' intent, as detailed herein, we assume the Commission would do its duty no matter who was pinched.

**13.** Petitioners also challenge the Commission's decision as a deprivation of First and Fifth Amendment rights. This argument is without merit. *See Buckley v. Valeo*, 424 U.S. 1, 96, 96 S.Ct. 612, 671, 46 L.Ed.2d 659 (1976) (citations omitted):

Congress' interest in not funding hopeless candidacies with large sums of public money necessarily justifies the withholding of public assistance from candidates without significant public support. Thus, Congress may legitimately require "some preliminary showing of a significant modicum of support" as an eligibility requirement for public funds. This requirement also serves the important public interest against providing artificial incentives to "splintered parties and unrestrained factionalism."

In their petition for review, petitioners raised a second issue–whether the Commission correctly refused to postpone the date of its post–primary audit of petitioners' books and records. Although this issue was raised in petitioners' motion for stay pending appeal, which this court denied June 19, 1980, it was not briefed by the parties, nor was it raised on oral argument. We will assume that petitioners have abandoned this issue, and we do not address it in our opinion.