642 F.2d 622
 206 U.S.App.D.C. 217, 81-1 USTC P 16,363
 COMMONWEALTH OF PUERTO RICO
v.
W. Michael BLUMENTHAL, Secretary, Department of the
Treasury, Appellant.
VIRGIN ISLANDS
v.
W. Michael BLUMENTHAL, Secretary, Department of the
Treasury, Appellant.
COMMONWEALTH OF PUERTO RICO, Appellant,
v.
W. Michael BLUMENTHAL, Secretary, Department of the Treasury.
 Nos. 79-1020, 79-1021* and 79-1024.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 16, 1979.
Decided Oct. 17, 1980.
Rehearing Denied Dec. 18, 1980.
Certiorari Denied May 18, 1981.
See 101 S.Ct. 2315.
 
 Ernest J. Brown, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., and David English Carmack, Atty., Dept. of Justice, Washington, D. C., were on brief for the Secretary of the Treasury as appellant.
 Michael J. Henke, Washington, D. C., with whom Charles D. Tetrault, Washington, D. C., was on brief for the Commonwealth of Puerto Rico as appellee and cross-appellant.
 Milton Eisenberg, Washington, D. C., with whom Theodore C. Hirt, Washington, D. C., and Ive Arlington Swan, Charlotte Amalie, V. I., were on brief for the Virgin Islands as appellee in case No. 79-1021.
 Myron C. Baum, Washington, D. C., also entered an appearance for the Department of Justice.
 Before McGOWAN and WALD, Circuit Judges, and JOHN PRATT,** United States District Judge for the District of Columbia.
 Opinion for the court filed by Circuit Judge McGOWAN.
 McGOWAN, Circuit Judge:
 
 
 1
 These consolidated appeals present a substantial controversy between the United States, on the one hand, and Puerto Rico and the Virgin Islands, on the other, with respect to the proper disposition of revenues derived from a tax of 4 cents per gallon imposed by the United States on the initial sale of gasoline in the United States by a producer or importer. 26 U.S.C. § 4081(a) (1976). Each of the island governments asserts that Congress has directed that such revenues in respect of gasoline manufactured in the islands and transported to the United States should be paid over to them. The District Court upheld that contention. We reverse.
 
 
 2
 * In 1898, the United States acquired Puerto Rico from the government of Spain pursuant to the Treaty of Paris, which ended the Spanish-American War. Treaty of Paris, Apr. 11, 1899, United States-Spain, 30 Stat. 1754. Soon after, Congress enacted the Foraker Act, also called the First Organic Act, 31 Stat. 77 (1900), which set up a provisional domestic government in Puerto Rico and provided revenues for the island's support. H.R.Rep. No. 249, 56th Cong., 1st Sess. 1-16 (1900). In order to aid the growth of Puerto Rican industries and professions, Congress provided in section 14 of the Foraker Act that "the internal revenue laws ... in view of the provisions of section three, shall not have force and effect in Porto Rico." Foraker Act, § 14, 31 Stat. 77, 80 (1900). In section 3, however, Congress limited this exemption by subjecting articles manufactured in Puerto Rico and shipped to the United States to a permanent tax "equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture." Foraker Act, § 3, 31 Stat. 77 (1900). The Act did not mandate any special treatment of these tax revenues, and all were retained by the United States Treasury.
 
 
 3
 In 1917, Congress passed the Second Organic Act eo nomine the Jones Act, 39 Stat. 951 (1917), which provided, inter alia, "(t)hat hereafter all taxes collected under the internal revenue laws of the United States on articles produced in Porto Rico and transported to the United States, or consumed in the island shall be covered into the treasury of Porto Rico." Jones Act, § 9, 39 Stat. 951 (current version at 26 U.S.C. § 7652(a)(3) (1976)) (emphasis added).[1] This cover over provision was enacted as part of the Puerto Rican Federal Relations Act of 1950, Pub.L.No. 600, 64 Stat. 319 (48 U.S.C. § 734), and is also codified at 26 U.S.C. § 7652(a)(3) (1976), the tax statute upon which Puerto Rico bases its claim.
 
 
 4
 Since the passage of the Jones Act, the United States Treasury has consistently covered over into the treasury of Puerto Rico revenues from manufacturer's excise taxes on liquor and tobacco produced in Puerto Rico and transported to the United States. During 1977 alone the revenues covered over totaled approximately $9 million in tobacco tax revenues and $134 million in liquor tax revenues (App. 297-98).
 
 
 5
 During fiscal year 1956-57 Puerto Rican manufacturers began to refine and ship gasoline to the United States. Upon sale, this gasoline was subject to a tax that has been levied since 1932 on all gasoline "sold by a producer or importer" in the United States. Revenue Act of 1932, § 617, 47 Stat. 169 (1932) (current version at 26 U.S.C. § 4081(a) (1976)). None of the revenues derived from gasoline manufactured in Puerto Rico and shipped to the United States have ever been covered over to Puerto Rico. The Secretary of the Treasury estimates that approximately $350,000,000 in tax revenues have been collected on Puerto Rican gasoline since 1956 (App. 213).
 
 
 6
 On September 13, 1974, the Governor of Puerto Rico wrote to the Secretary of the Treasury, requesting that both past and future tax revenues on gasoline produced in Puerto Rico and transported to the United States be covered over into the treasury of Puerto Rico (App. 15). After exchanging letters and legal memoranda regarding the cover over provision, the parties could not agree, and the Secretary formally rejected Puerto Rico's claim on June 10, 1975 (App. 59).
 
 
 7
 Puerto Rico brought suit in the District Court, seeking declaratory relief, mandamus, an injunction against future retention of the gasoline tax revenues, and an accounting of all sums unlawfully withheld in the past. Commonwealth of Puerto Rico v. Blumenthal, No. 75-1035 (D.D.C. Oct. 10, 1978). On October 10, 1978, the District Court granted partial summary judgment. The court held that Puerto Rico is entitled to all tax revenues henceforth collected on gasoline manufactured in Puerto Rico and transported to the United States, but limited Puerto Rico's recovery of the past tax revenues to those collected after September 13, 1974, when Puerto Rico first informed the Secretary of the Treasury of its claim. Id. at 15-18. The court reasoned that Puerto Rico had "slept on its rights" and therefore was barred from full recovery by the equitable doctrine of laches.[2]
 
 
 8
 The facts of the Virgin Islands case are essentially the same. The Virgin Islands were acquired from Denmark pursuant to the Treaty of August 4, 1916, United States-Denmark, 39 Stat. 1706. On March 3, 1917, Congress passed an act providing for government of the Virgin Islands. Act of March 3, 1917, 39 Stat. 1132 (1917). Included was a tax provision analogous to section 3 of the Foraker Act. In its current form, the Virgin Islands equalization tax statute provides in pertinent part:
 
 
 9
 Taxes imposed in the United States.-Except as provided in section 5314, there shall be imposed in the United States, upon articles coming into the United States from the Virgin Islands, a tax equal to the internal revenue tax imposed in the United States upon like articles of domestic manufacture.
 
 
 10
 26 U.S.C. § 7652(b)(1) (1976). The Internal Revenue code now provides for cover over of a certain percentage of
 
 
 11
 all taxes imposed by, and collected during the fiscal year under, the internal revenue laws of the United States on articles produced in the Virgin Islands and transported to the United States.
 
 
 12
 26 U.S.C. § 7652(b)(3) (1976).
 
 
 13
 In 1966, the Virgin Islands began to refine gasoline for sale in the United States. All such gasoline sold in the United States was taxed pursuant to the same gasoline tax, 26 U.S.C. § 4081(a) (1976), at issue in the Puerto Rico case. The United States Treasury neither covered over these funds nor set up a special fund for the benefit of the Virgin Islands. The Virgin Islands sued seeking, among other relief, (1) a declaratory judgment that the gasoline excise tax revenues collected by the Treasury since 1966 should be covered into the treasury of the Virgin Islands, and (2) payment of all future taxes and all past taxes wrongfully withheld. Virgin Islands v. Blumenthal, No. 76-0916 (D.D.C. Oct. 11, 1978). The District Court granted the Virgin Islands' motion for summary judgment.
 
 
 14
 Four appeals in all were consolidated for hearing and disposition. Nos. 79-1020 & 1024 are the cross-appeals involving the gasoline tax issue with respect to Puerto Rico. Nos. 79-1021 & 1022 are the cross-appeals involving both the gasoline tax and customs duties issues with respect to the Virgin Islands.
 
 
 15
 This opinion deals with the gasoline tax questions as to both Puerto Rico and the Virgin Islands. A companion opinion issued simultaneously herewith disposes of the customs duties problems which are confined to the Virgin Islands. We consider the gasoline tax questions together because the cover over statute upon which the Virgin Islands rely is in all essential aspects identical to that of Puerto Rico, and almost certainly was consciously patterned after the Puerto Rico provision. See S.Rep. No. 1271, 83rd Cong., 2d Sess. 4 (1954); S.Rep. No. 476, 80th Cong., 1st Sess. 2-3 (1947). The District Court as well as the parties themselves, focused on the Puerto Rico cover over provision throughout the litigation and assumed that an interpretation of the meaning of the Puerto Rico cover over provision determines the meaning of the other provision as well. Virgin Islands v. Blumenthal, No. 76-0916 (D.D.C. Oct. 11, 1978), slip op. at 2. We adopt this approach, and assume that an interpretation of the Puerto Rico statute is applicable to the Virgin Islands statute as well.
 
 II
 
 16
 The District Court held that the cover over provision by its terms is all-inclusive and should be interpreted broadly, not limited only to Foraker Act taxes. The court read the cover over provision to require the covering over to Puerto Rico of all taxes on all articles produced in Puerto Rico and transported to the United States, without regard to which statutory provision imposes the tax. But, the court found further, even under the narrower view of the cover over provision espoused by the United States, the gasoline tax revenues must be covered over because the gasoline tax is in all respects similar to the liquor and tobacco taxes, the revenues from which have traditionally been covered over. We conclude, however, that the United States correctly withheld the gasoline tax revenues, and that the District Court erred in ordering the United States to cover over these funds.
 
 
 17
 This case abounds in ambiguities, as the Government readily admits. It may be useful, therefore, to precede the detailed discussion that follows with a brief summary of the considerations we believe to be determinative.
 
 
 18
 In 1901 the Foraker Act dealt generously with Puerto Rico by exempting it generally from United States taxation. In the course of doing so, however, Congress recognized that mainland manufacturers subject to an excise tax on manufacture would be unfairly disadvantaged if Puerto Rican manufacturers making the same product were not subject to an equivalent tax. To equalize the competitive positions of the two, the Foraker Act provided that articles made in Puerto Rico and sent to the mainland market should be subject to an excise tax on manufacture at the same rate as that laid in respect of mainland manufacturers. Thus, for example, Puerto Rican manufacturers of cigars and spirits would have to pay an excise tax on those goods in the same way and in the same amount as a mainland cigar maker and distiller was required to pay.
 
 
 19
 For many years these excise taxes collected on Puerto Rican products were retained in the United States Treasury. When Congress passed the Jones Act in 1917, it decided, in order to ease the financial plight of Puerto Rico, to cover over these excise taxes collected in Puerto Rico into the Puerto Rican Treasury.
 
 
 20
 In 1956 the refining of gasoline first began in Puerto Rico. But there was not then, nor has there been since, any excise tax imposed by the United States on the manufacture of gasoline. In contrast with a distiller who becomes liable for a tax when whiskey comes into being, no tax is levied upon gasoline until it is first sold by the producer or the importer. Thus, Puerto Rican and mainland gasoline meet in the market on equal terms, and there is no occasion to equalize their competitive positions by taxing the manufacture of gasoline in Puerto Rico. There being no such tax, there is nothing to cover over into the Puerto Rican Treasury in respect of gasoline.
 
 
 21
 In so holding, we reach two conclusions: (1) that Congress intended to cover over only those taxes laid for equalization purposes, and (2) that the gasoline tax statute is not such a tax. We examine each such conclusion in turn.
 
 III
 
 22
 We consider, first, the linkage vel non of the cover over provision and the Foraker Act taxation provision. The cover over statute at issue provides:
 
 
 23
 All taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds, and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico.
 
 
 24
 26 U.S.C. § 7652(a)(3) (1976). We begin by observing that the cover over provision is not clear and unambiguous, contrary to the District Court's assertion.[3] Rather, the cover over provision is replete with ambiguities requiring recourse to traditional methods of statutory construction.[4]
 
 
 25
 Primary among these ambiguities is the meaning of the phrase "all taxes" in the context of the cover over provision. Interpreted literally, the statute requires the covering over of all tax revenues ever collected when an article from Puerto Rico later becomes the subject of a taxable transaction in the United States: this would require the covering over even of estate and gift taxes levied years after the article entered the United States and mixed with domestic goods in the general market.
 
 
 26
 The administrative problems inherent in such a reading of the cover over provision are truly staggering. To effectuate this interpretation, Congress would have to separate Puerto Rican goods from other articles before sale, after sale, and throughout the useful life of the article, or else develop tracing procedures for every type of article that Puerto Rico transports to the United States. Both scenarios are so impossible, both of conception and of practical application, as to render such a broad interpretation ridiculous. Indeed, even Puerto Rico admits that such an interpretation is "absurd." Brief for Appellee at 5-6 n.7. We must conclude that the phrase "all taxes" is, in the context of a cover over statute, ambiguous, requiring some form of modification or limitation.[5]
 
 
 27
 Given this initial ambiguity, the modifying phrase "on articles produced in Puerto Rico and transported to the United States" assumes crucial importance, yet it too is ambiguous. It is unclear from the language of the statute whether this phrase describes the taxable event-taxes laid primarily because the article is produced in Puerto Rico and transported to the United States-or instead is intended to describe a class of articles, all or some of the taxes upon which must be covered over into the island treasury. The scope of the cover over provision varies tremendously with the meaning of this phrase.[6] Yet, on its face, the phrase is susceptible to either interpretation.
 
 
 28
 Contrary to the District Court's holding, then, we find that the cover over provision is highly ambiguous. We therefore must resort to the traditional statutory interpretation aids, such as legislative history and administrative construction, in order to determine the scope of the cover over provision.
 
 A. Legislative History
 
 29
 The legislative histories of the Foraker and Jones Acts show that the two provisions at issue were enacted at different times for apparently different purposes. Nevertheless, this by no means renders the two provisions unrelated or contradictory. On the contrary, the legislative histories of both provisions indicate that the two are interrelated; in fact, the cover over provision is most logically explained as an outgrowth of the Foraker "equalization tax" provision.
 
 1. The Foraker Act
 
 30
 The Foraker Act, 31 Stat. 77 (1900), was Congress's first attempt to provide a government and economic structure for the newly acquired territory of Puerto Rico.[7] Most important of the Foraker Act provisions, for purposes of this case, was the imposition of a permanent tax in section 3. Section 3 provided, in relevant part, for the
 
 
 31
 (imposition) upon articles of merchandise of Porto Rican manufacture coming into the United States and withdrawn from consumption or sale ... (of) a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture; ... and on all articles of merchandise of United States manufacture coming into Porto Rico ... (of) a tax equal to the internal revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture.
 
 
 32
 Foraker Act, § 3, 31 Stat. 77 (1900) (current versions at 26 U.S.C. §§ 7652(a) (1) and 7653 (1976)). No special treatment of the revenues collected under this tax was required by the Foraker Act, and until 1917 all revenues collected pursuant to the provision were retained by the United States Treasury.[8]
 
 
 33
 This provision can accurately be termed an "equalization tax," because it was enacted to plug a loophole created by Congress's decision, in section 14 of the Foraker Act, to exempt Puerto Rico from the internal revenue laws of the United States.[9] As Representative Payne, Chairman of the Committee reporting the bill, explained on the floor of the House:
 
 
 34
 (i)t occurred to me at once that if we allowed Puerto Rico cigars to come in here without paying an internal-revenue tax, it placed our people at a disadvantage. Our manufacturers would have to pay the 25 per cent of the duties ... and in addition they would have to pay the internal revenue tax. I thought the Cigar Makers' Union had a just grievance against the proposition.
 
 
 35
 33 Cong.Rec. 1944 (1900). See also 33 Cong.Rec. 2477, 3515 (1900) (remarks of Sen. Foraker). Representative Payne alluded specifically to the manufacturer's excise tax on tobacco, which was imposed only on tobacco produced in the United States or imported into the United States from a foreign country. By excluding Puerto Rico from the internal revenue laws, Congress had held, in effect, that Puerto Rican tobacco was neither domestic nor foreign, and therefore would escape tax absent the Foraker Act tax.
 
 
 36
 This interpretation of the tax provision pervades the legislative history of the Foraker Act. As was stated in the Committee Report accompanying the bill, "The last provision (section 3) is necessary in order that our manufacturers of cigars and spirits may be at no disadvantage on account of the low tariff between Puerto Rico and the United States, on account of our internal revenue laws." H.R.Rep.No. 249, 56th Cong., 1st Sess. 1-2 (1900). This reading was also adopted by the Supreme Court in Jordan v. Roche, 228 U.S. 436, 443, 33 S.Ct. 573, 575, 57 L.Ed. 908 (1913), in which the Court stated that "(t)he purpose of the Foraker Act was the equal taxation of Porto Rican articles and domestic articles."
 
 
 37
 It is most important that we define clearly the scope of the Foraker taxation provision now codified at 26 U.S.C. § 7652(a)(1) (1976), since the ultimate disposition of this suit turns on whether the tax laid on gasoline shipped from Puerto Rico to the United States since 1956 was levied pursuant to the Foraker tax provision or to 26 U.S.C. § 4081(a) (1976). Fortunately, the legislative history of the Foraker Act allows us to draw three unequivocal conclusions regarding the statute's purpose and scope.
 
 
 38
 First, the Foraker tax provision functions purely as an "equalization" provision. This is clear from both the purpose and the form of the statute. It was intended to equalize competition in those situations in which a Puerto Rican article being transported into the mainland market would have escaped a tax laid on similar domestic goods purely because of the peculiar tax status of Puerto Rico. Thus, the equalization tax comes into play not because of the manufacture, importation, or sale of the article-the usual taxable events found in tax statutes-but because of the existence of some domestic tax which, due to Puerto Rico's exemption from tax, reaches articles produced on the mainland but does not reach comparable goods in Puerto Rico. That the Foraker tax provision is triggered by the levying of some domestic tax threatening to skew competition is reflected in the form of the statute. It requires the imposition of a tax "equal" to one imposed in the United States on similar domestic goods.
 
 
 39
 A second precondition is apparent from the purpose of the statute and is reflected in the statutory language: the domestic tax must be laid at some point in the commercial cycle when the Puerto Rican article is exempt from United States tax. The Internal Revenue Service ("IRS") has interpreted this to mean that the domestic tax must be laid on the act of manufacture. See O'Connell letter, III-B infra. Congress's focus on the liquor and alcohol taxes (both manufacturer's excise taxes) further strengthens the assumption that the domestic tax at issue will generally be a tax on manufacture, because such taxes clearly fail to reach articles of Puerto Rican manufacture.[10]
 
 
 40
 Third, the article must be manufactured in Puerto Rico and shipped to the United States for sale. The equalization tax was intended to apply only where an anticompetitive situation might be created due to a domestic tax, and this can only occur when the Puerto Rican article is brought into competition with the taxed domestic article.
 
 
 41
 On the basis of the statute's legislative history and language, then, we read the Foraker Act as imposing an equalization tax, as a condition of entry into the mainland market, on any Puerto Rican article that has escaped a tax previously laid on comparable American-made articles. Only when this equalization function is needed does the Foraker provision come into play. Furthermore, as far as we can discern, only domestic taxes on manufacture require such equalization. Any tax that applies equally to Puerto Rican and mainland goods, such as a tax on sale, does not require the application of a "mirror-like" equalization tax. It is primarily on the basis of this conclusion, that the Foraker provision imposes an equalization tax, that we eventually conclude that the gasoline tax revenues at issue need not be covered over.[11]
 
 2. The Jones Act
 
 42
 The cover over provision, now codified at 26 U.S.C. § 7652(a)(3) (1976), was first enacted in 1917 as section 9 of the Jones Act, also termed the Second Organic Act, 39 Stat. 951, which dealt principally with the civil government and trade relations of Puerto Rico. H.R.Rep.No. 77, 64th Cong., 1st Sess. 1-2 (1916). As originally phrased, the statute provided:
 
 
 43
 That hereafter all taxes collected under the internal-revenue laws of the United States on articles produced in Porto Rico and transported to the United States, or consumed in the island shall be covered into the Treasury of Porto Rico.
 
 
 44
 Jones Act, § 9, 39 Stat. 951 (1917).
 
 
 45
 The purpose of the cover over provision becomes clear within its historical context. Puerto Rico, a small, resource-poor island, was then, as now, dependent on imports for its necessities. In the years preceding the First World War, Puerto Rico imported European goods upon which it could impose customs duties. With the outbreak of the war, however, trade with Europe was disrupted and Puerto Rico was forced to rely on duty-free imports from the United States, losing a tremendous amount of revenue as a result. H.R.Rep.No. 77, 64th Cong., 1st Sess. 1-2 (1916). To remedy this situation, Congress enacted the cover over provision. As the House Committee on Insular Affairs noted, "The loss of this revenue has seriously embarrassed the Porto Rican Government, and it is believed to be but just and fair that it should receive the internal revenue taxes collected upon its products." Id.
 
 3. Linkage of the Two Provisions
 
 46
 As to the general purposes of the two provisions, the parties herein do not disagree. The scope of the cover over provision, however, is hotly disputed and represents the major question for our determination.
 
 
 47
 The District Court argued that Congress, recognizing Puerto Rico's precarious economic situation, intended the cover over provision to be broad. The court cited language in the legislative history of the Jones Act wherein the Senate Committee on Pacific Islands and Porto Rico ascribed a broad charitable purpose to the cover over provision and noted that the provision should be "all inclusive." S.Rep.No. 579, 64th Cong., 1st Sess. 2 (1916). From this, the court concluded that Congress intended to cover over more than just equalization taxes. Commonwealth of Puerto Rico v. Blumenthal, No. 75-1035, at 9-11.
 
 
 48
 The United States argues from the same language that Congress intended the cover over provision to apply to all equalization taxes, but to no other taxes. We find the United States's argument the more convincing in four respects.
 
 
 49
 First, the original drafted form of the cover over provision indicates Congress's assumption that only equalization tax revenues would be affected by the cover over provision. Although the cover over provision currently stands alone as 26 U.S.C. § 7652(a)(3) (1976), in its original drafting it was phrased as a proviso to another portion of the Jones Act:
 
 
 50
 That the statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Porto Rico as in the United States, except the internal-revenue laws: Provided, however, that hereafter all taxes collected under the internal-revenue laws of the United States on articles produced in Porto Rico and transported to the United States, or consumed in the island shall be covered into the treasury of Porto Rico.
 
 
 51
 39 Stat. 951 (emphasis added).
 
 
 52
 On its face, this is an odd construction, since the cover over provision is apparently an extension of the favorable treatment of Puerto Rico implicit in its exemption from the internal revenue laws (App. 88). This construction makes sense only if an assumption is read in: that the cover over proviso refers to the equalization taxes, which truly do limit the benefits Puerto Rico derives from the exemption. Once this is assumed, the linkage of the exemption and the cover over provision becomes quite logical: Congress decided to limit the blanket exemption by imposing equalization taxes and by rebating those revenues to the Puerto Rican government, not to the people directly.
 
 
 53
 This interpretation is strengthened by the restatement, in the Jones Act, of the blanket exemption first passed as Section 14 of the Foraker Act. The Foraker Act originally provided that "the internal revenue laws ... in view of the provisions of section three (the Foraker tax provision), shall not have force and effect in Puerto Rico." Foraker Act, § 14, 31 Stat. 77, 80 (1900) (emphasis added). That Congress restated this provision in the Jones Act suggests that the new exemption was also enacted "in view of" the Foraker tax.
 
 
 54
 Equally as telling is the legislative history accompanying the Jones Act. In explaining the addition of a cover over provision to the previously enacted exemption, the House Committee on Insular Affairs stated:
 
 
 55
 It appears that the present rule is to pay into the Porto Rican treasury those taxes that are collected under the internal-revenue laws of the United States on articles produced and used in Porto Rico, and into the Treasury of the United States internal-revenue taxes collected on articles produced in Porto Rico but transported to the United States.
 
 
 56
 H.R.Rep.No. 77, 64th Cong., 1st Sess. 1-2 (1916). This describes, albeit rather inaccurately, the treatment of taxes collected pursuant to the equalization tax provision.[12] The Committee report then continued:
 
 
 57
 In the opinion of your committee these taxes should all be covered into the treasury of Porto Rico ... The customs duties collected in Porto Rico have fallen off in the last three or four years ... The loss of this revenue has seriously embarrassed the Porto Rican Government, and it is believed to be but just and fair that it should receive the internal-revenue taxes collected upon its products, whether those products are used in Porto Rico or produced in Porto Rico and transported and used in the United States.
 
 
 58
 Id. (emphasis added). The Committee clearly referred to the Foraker equalization taxes in calling for the covering over of "these taxes."
 
 
 59
 During the House debates, Representative Miller spoke in support of the cover over provision, using as an example tobacco taxes, which were specifically focused upon by the framers of the equalization tax. See 33 Cong.Rec. 1944 (1900). He described the taxes at issue as "excise taxes," on articles "consumed in the United States, having been imported from Puerto Rico," and then noted that "It is proposed in this bill that that sum of money shall go into the treasury of Puerto Rico." 53 Cong.Rec. 7475 (1916) (emphasis added). These are only two of numerous examples within the legislative history of framers' specific references to equalization taxes when discussing the scope of the new cover over provision. It is apparent that the cover over provision framers were not working in a vacuum; rather, they specifically considered a certain class of taxes when determining whether to enact the cover over provision. Never within the legislative history do we find a general description, such as "all inclusive," that is not preceded by a description of an equalization tax.
 
 
 60
 Throughout the legislative history accompanying the Jones Act, we also find less direct, but equally valuable, evidence that the taxes to be covered over were to be equalization taxes. In the House Report accompanying the Jones Act, the Committee used the amount that had been paid into the Treasury pursuant to the Foraker Act ($500,000) as a reasonable estimate of how much money Puerto Rico could expect to have covered over to its treasury in the future. H.R.Rep.No. 77, 64th Cong., 1st Sess. 2 (1917). And we note that the appellation "just" used by the House Committee in describing the cover over provision, id., was almost a direct quotation from the House Report accompanying the Foraker Act and was used to describe the equalization tax provision. H.R.Rep.No. 249, 56th Cong., 1st Sess. 6 (1900).
 
 
 61
 The fourth and most decisive factor indicating the linkage of the two provisions was the amendment of the cover over provision on the floor of the Senate. When the cover over provision came to the Senate floor for a vote, it extended only to articles "manufactured in Puerto Rico and transported to the United States." The Senate amended it to apply to goods "manufactured in Porto Rico and transported to the United States, or consumed in the island."
 
 
 62
 Puerto Rico and the District Court have made much of this amendment, arguing that it devastates the United States' argument by extending the cover over provision to taxes that are not equalization taxes.[13] On the contrary, this amendment is powerful evidence in the United States's favor. As we noted above, the equalization tax applied quid pro quo, providing for the imposition not only of a tax on goods manufactured in Puerto Rico and transported to the United States, but also of a complementary tax "on all articles of merchandise of United States manufacture coming into Porto Rico ... of a tax equal in rate and amount to the internal-revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture."[14]
 
 
 63
 By amending the cover over provision to include articles "consumed in the island," Congress made the cover over provision perfectly coextensive with the Foraker equalization tax. The conclusion is inescapable that Congress did so intentionally. The phrase "consumed in the island" could only have applied to taxes laid pursuant to the equalization tax, since Congress had provided that all other internal revenue taxes would not apply "in Puerto Rico." Foraker Act, § 14, 31 Stat. 77 (1900). Puerto Rico's argument-that this clause applies to other United States taxes laid on locally manufactured and consumed goods-is simply incorrect, since no such taxes existed.
 
 
 64
 Thus, the phrase "consumed in the island" is meaningless unless it applies to the equalization tax laid on goods transported from the United States to Puerto Rico. Furthermore, for Congress to have amended the statute to cover exactly all of the equalization taxes indicates an intent to limit the cover over provision accordingly. We conclude that the amendment was intended to tie the cover over provision more closely to the Foraker equalization tax provision and to make the two provisions identical in scope.
 
 
 65
 Puerto Rico challenges our reading of the legislative history on three grounds. First, Puerto Rico points to the broad descriptions of the cover over provision that are contained within the legislative history, the most obvious being the description of the Senate amendment as having made the cover over provision "all inclusive, which is the intent." S.Rep.No.579, 64th Cong., 1st Sess. 2 (1916). As we have noted above, though, the Senate amendment merely extended the cover over provision to the only remaining portion of Foraker equalization taxes not yet included in the cover over provision; thus, the amendment certainly is not authority for the proposition that the cover over provision is broader than the equalization tax provision. Rather, given the nature of the amendment, the "all inclusive" language likely refers to inclusion of all equalization taxes.
 
 
 66
 More generally, Puerto Rico challenges any conclusion, on the basis of the legislative history, that the cover over provision is limited to equalization taxes. Although Congress may have been considering equalization taxes in framing the statute, Puerto Rico argues, Congress in no way evinced an intent to so limit the cover over provision's scope. This is especially true since, at the time the cover over provision was passed, the only taxes on Puerto Rican liquor and tobacco, Congress's greatest concerns, were equalization taxes; the retail sales tax and War Excise taxes had not yet been enacted.[15] We are urged not to interpret Congress's allusions to equalization taxes, then, as signs that Congress intended to limit the seemingly expansive language of the cover over statute.
 
 
 67
 This argument is true as far as it goes, in that legislative intent to include certain specific taxes does not necessarily exclude other taxes of a similar genre that may be enacted at some future time. Jordan v. Roche, 228 U.S. 436, 443, 33 S.Ct. 573, 575, 57 L.Ed. 908 (1913) ("the internal revenue laws do not describe articles by name but by character"). In this instance, however, we believe this fact cuts the other way, to explain why Congress did not limit the cover over provision to Foraker taxes in a more specific manner.
 
 
 68
 In this particular case we are convinced that Congress specifically intended to cover over only equalization taxes. Congress amended the cover over provision to be exactly coextensive with the Foraker Act, which indicates a specific focus on the equalization taxes. Furthermore, those legislators who described the purview of the cover over provision uniformly described the covered taxes by genre : taxes on "those articles manufactured in Puerto Rico and transported to the United States."[16] The District Court cited these general descriptions for the proposition that the cover over tax is broader than the equalization tax, but we think the better interpretation is that Congress intended the cover over provision to cover all equalization taxes and no others. Third, the original drafted form of the cover over provision suggests that Congress assumed the cover over provision applied only to equalization taxes. Once it is assumed that the peculiar "proviso" form of the original drafting indicates this linkage, it follows inescapably that the proviso applies only to equalization taxes since the "proviso" construction would be illogical applied to any but equalization taxes. Thus, the cover over and equalization taxes seem closely linked, and Congress's intent to link them, regardless of later tax developments, is a sound conclusion.
 
 
 69
 Finally, we address Puerto Rico's general policy contention, which was adopted by the District Court in its opinion, that these two provisions cannot be linked because they were enacted at different times for different purposes. The argument, as phrased by Puerto Rico, is that the two provisions "derived from two entirely different statutes, enacted for totally different purposes seventeen years apart." Brief for Appellee at 11. The implicit assumption is that the latter statute-the cover over provision-contradicted the former at least in spirit.
 
 
 70
 Since we have just interpreted the legislative history of the Jones Act to indicate that the cover over provision applies only to equalization taxes, this argument would seem to be moot. If Congress in fact considered the two provisions related and acted upon that assumption, as we have held to be the case, neither Puerto Rico nor any court may interpose a different interpretation as a matter of hindsight.
 
 
 71
 But even if the legislative history were inconclusive, we could not accept the premise that the two statutes are contradictory in spirit and therefore irreconcilable. On the contrary, we believe that these enunciated "contradictory" goals, while accurate descriptions of the purposes behind the two provisions, are oversimplifications of Congress's purposes for passing the two Acts in toto. Considered in tandem, the two Acts appear intimately related, such that the latter statute-the cover over provision-is a logical outgrowth of the former.
 
 
 72
 The equalization taxation provision was in fact inspired by protectionist sentiments, while the cover over provision was primarily designed to bring revenue into the coffers of the Government of Puerto Rico. But it is quite inaccurate to label the equalization tax "protectionist" and the cover over provision "charitable" and abandon all attempts to reconcile the two. The equalization tax was made necessary only because Congress, elsewhere in the Foraker Act, indulged its charitable impulses toward Puerto Rico by exempting Puerto Rico from tax.[17] Thus, it is gross oversimplification to label the equalization tax merely a "protectionist" gesture. Rather, the tax represents an informed decision by Congress to balance its charitable impulses toward Puerto Rico against the need to protect mainland manufacturers from the results of Congress's altruism.
 
 
 73
 Similarly, the Jones Act cover over provision cannot be viewed in a vacuum. The thrust of the Jones Act was not simply charity toward Puerto Rico; the Act was intended primarily to integrate Puerto Rico into the United States federation to give its citizens the benefits of United States citizenship.[18] The Jones Act as a whole thus evidences a balancing process similar to that which occurred in the Foraker Act. Together the Foraker and Jones Acts can be seen as an ongoing attempt to enact a body of laws benefiting Puerto Rico and not injuring the United States mainland, and all the provisions of both Acts can be seen as means toward that end. The Jones Act debates contain numerous allusions to the Foraker Act,[19] and the tone of the debates indicates that Congress envisioned itself as improving upon reforms begun in the Foraker Act.[20] Notably, the two Acts were generally referred to as the "First and Second Organic Acts." Any assumption that their provisions are mutually exclusive is, therefore, unsupported by the Acts themselves.
 
 
 74
 But even if the Jones Act had represented a departure from earlier legislative policy, it is simply illogical to assume that the Congress enacting the Jones Act would not have made use of the equalization tax provision if that had seemed a logical and fair manner of aiding Puerto Rico. In enacting statutes to meet current needs, Congress does not ignore all statutes that went before, merely because those older statutes were enacted to meet different needs. In such a situation, the test is not the purposes of the statutes, but the statutory language-whether the two statutes can coexist and, together, effectuate some desired legislative policy. Nothing in these two statutes prevents their coexistence, and, more important, nothing prevents their linkage.
 
 
 75
 In fact, to assume that two such statutes could not coexist seems especially fallacious in this instance. The Foraker tax provision generates a discrete body of taxes, all collected at the same time, the covering over of which would be administratively simple, extremely helpful to Puerto Rico, and, in a sense, rather "just and fair" since the equalization taxes were imposed not for general revenue purposes benefiting all Americans, but for the purpose of protecting mainland manufacturers. To assume that Congress, in enacting a "charitable" provision, would not have made use of such an obvious tool simply because the tool was originally enacted for another purpose is simply unrealistic.
 
 
 76
 Of course, the fact that we can, with hindsight, see the covering over of Foraker taxes as a logical solution to Puerto Rico's dilemma does not mean that this was the route chosen by Congress; we cannot read our legislative preferences into the law. But it does cast doubt on Puerto Rico's assertion that Congress could not have intended to cover over only equalization taxes.
 
 
 77
 In sum, we read the legislative history surrounding the passage of the cover over provision and the subsequent amendment of the statute to indicate that Congress intended to limit the scope of the cover over provision to Foraker taxes. While there are phrases within the legislative history susceptible to multiple interpretations, only the United States's interpretation of the cover over provision is consistent with (1) the overall purposes of both Organic Acts, (2) the original drafting of the statute, (3) the numerous references within the legislative history indicating that the cover over provision was tied to previous legislative enactments, and (4) the amendment of the statute to be absolutely coextensive with the equalization tax.
 
 
 78
 We also base our interpretation of the cover over provision, to a very great extent, on the inability of the District Court to marshal any legislative history supporting its exceedingly broad interpretation, or else to limit that broad interpretation in a principled fashion. The District Court and Puerto Rico completely ignore the fact that the broad language of the statute must be limited in some fashion, or else the "plain meaning" of the statute requires an absurd result. Our interpretation is, in our view, more consistent with Congress's ongoing attempt to benefit Puerto Rico without unduly harming mainland Americans.
 
 B. Administrative Constructions
 
 79
 The District Court pretermitted any discussion of administrative constructions of the cover over provision by interpreting the cover over provision according to its "plain meaning." But, having held that the statute is by no means unambiguous, we undertake an examination of the administrative constructions of the cover over provision by the United States Treasury, the government agency charged with the statute's enforcement. The interpretation of a statute by that federal agency charged with the statute's enforcement is entitled to great weight in a court's construction of ambiguous statutory language,[21] especially when, as in this case, "Congress has opted for legislative generality, leaving the agency with the task of definition on a case-by-case basis." Chisholm v. Federal Communications Commission, 538 F.2d 349, 358 (D.C.Cir.), cert. denied, 429 U.S. 90, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).
 
 
 80
 We find that a consistent administrative interpretation of the cover over provision supports our reading of the legislative history. The Treasury has repeatedly held that the cover over provision applies only to equalization taxes. These interpretations are entitled to great weight because they are both consistent and public. The Treasury has adhered to the same basic interpretation of the cover over provision for 50 years, and Puerto Rico has never challenged this interpretation nor Congress amended the statute to override this interpretation.
 
 
 81
 We rely on four major administrative constructions. The best publicized administrative interpretation of the cover over provision was undertaken by Acting Secretary of the Treasury O'Connell, in a letter transmitted to the Senate Finance Committee in 1947,[22] when the Senate was considering enacting an analogous cover over provision (S. 1014) for the Virgin Islands.[23] In his letter, the Acting Secretary interpreted the Puerto Rico cover over provision as follows:
 
 
 82
 It is the understanding of the Department that, insofar as S. 1014 relates to the internal revenue taxes collected upon articles produced in the Virgin Islands and transported to the United States, the tax proceeds segregated by the bill to the Virgin Islands are ... such taxes as are due and payable at the time the Virgin Islands article is withdrawn from customs for the consumption or sale in the United States. It is the further understanding of the Department that the bill does not cover taxes collected with respect to Virgin Islands articles after they have entered within the United States; that is that the bill does not cover such taxes as Federal retail sales taxes collected with respect to Virgin Islands articles sold at retail in the United States, nor the tax on manufactured sugar which may be paid by the manufacturer under section 3490 of the Internal Revenue Code with respect to Virgin Islands raw sugar refined in the United States ... The views expressed above as to the internal revenue taxes covered by S. 1014 are the construction which the Department has given to section 3360(a) (now the Puerto Rico cover over provision codified at 26 U.S.C. § 7652(a)(3) (1976)) of the Code in the case of internal revenue taxes segregated to Puerto Rico.
 
 
 83
 (App. 25) (emphasis added).
 
 
 84
 In so holding, O'Connell held that the cover over provision applies only to those taxes we have identified as equalization taxes: those taxes imposed as conditions of entry into the United States, not those domestic taxes imposed on all goods alike after the goods enter the mainland market.[24]
 
 
 85
 The Treasury again undertook an exhaustive discussion of the cover over provision in a memorandum from Chief Counsel Oliphant of the IRS to Deputy Commissioner Valaer, dated July 9, 1951. (Doc. C-62) (App. 366). In this memorandum Oliphant determined that the cover over provision applies only to Foraker equalization taxes. His conclusion was based, first, on the equalization purpose of the Foraker tax provision. Given this, he said, clearly the Foraker provision was not intended to extend to any taxes "the liability for which would not attach until after the Puerto Rican goods have entered into commerce within the United States." (App. 369). No equalization is necessary in such a case.
 
 
 86
 Oliphant went on to conclude that only equalization taxes need be covered over to Puerto Rico. He noted that the same factor making equalization unnecessary-taxation after the Puerto Rican and mainland goods enter the United States market on equal terms-also makes cover over of such tax revenues impossible, absent tracing (App. 370). Furthermore, he noted briefly that cover over of any taxes from which Puerto Rico was never exempt in the first place seems fundamentally illogical. Id. Oliphant's ultimate conclusion-that only liquor and tobacco require equalization taxes-has since been repudiated by the IRS, in favor of a more general view comporting with our interpretation herein,[25] but this in no way undercuts the validity of his general argument, which is closely tied both to the legislative purpose of the two provisions and to simple logic.
 
 
 87
 A shorter IRS file memorandum reiterated this interpretation of the cover over provision to apply only to those revenues from taxes imposed upon manufacture or before withdrawal for sale. Doc. C-6, May 1, 1947 (App. 360-365). The author of this file memorandum clearly linked the cover over and the equalization tax provisions. He noted that the purpose of the Foraker tax is to equalize competition, and this is necessary only when the article escapes a tax laid before that article reaches the mainland. As he stated,
 
 
 88
 After articles have entered the country, been merged with the commerce of the United States, if they have become subject to Federal retail or manufactures tax, or processing tax, tax proceeds have never been segregated to the Philippines or Puerto Rico unless specifically directed by statute.
 
 
 89
 Doc. C-7, May 1, 1947 (App. 365). He then held that taxes not imposed under the Foraker tax provision need not be covered over to the Treasury of Puerto Rico (App. 362).
 
 
 90
 The most detailed interpretation of the Foraker equalization tax provision appears in Revenue Ruling 58-554, 1958-2 C.B. 909, in which, as noted above,[26] the IRS overruled the narrow application of the equalization tax only to liquor and tobacco. In this ruling, the IRS also held that the equalization tax is triggered only by a domestic tax on the manufacture of goods, not by a tax on the sale of goods. This revenue ruling is of crucial importance because the IRS had occasion to consider directly the application of the equalization tax provision to the gasoline tax at issue here.
 
 
 91
 This revenue ruling concluded that certain taxes imposed by Chapter 32 of the Code (including the gasoline tax) need not be covered over because
 
 
 92
 the general wording of the statute, references thereto by Congress, and its purpose as expressed by the Supreme Court of the United States indicate that any articles may be so subjected, provided the tax relating thereto is laid on the act of manufacturing rather than the act of sale.
 
 
 93
 (emphasis added). The IRS explained:
 
 
 94
 Administrative considerations and departmental policy further indicate that the only taxes imposed by section 7652 of the Code are those which can be imposed at the time of entry of the goods into the United States or at the time they are withdrawn from places of government supervision.... a tax on the act of manufacturing, as distinguished from a tax on the act of sale, would be within the purview of section 7652 of the Code. The manufacturers excise tax imposed by Chapter 32 of the Code and the retailers excise tax imposed by Chapter 31 of the Code are examples of taxes excluded from the meaning of the phrase "the internal revenue tax" in section 7652(a)(1) of the Code. Those taxes are imposed on the sale and not on the act of manufacturing.
 
 
 95
 (emphasis added).
 
 
 96
 The gravamen of the IRS ruling is on all fours with our view: the IRS reasoned that, since Chapter 32 taxes (including the gasoline tax) are imposed at the point of sale, they do not create the unequal tax burden requiring application of the equalization tax.
 
 
 97
 In sum, the Treasury has consistently interpreted the cover over and equalization tax provisions in a manner that comports with our view of the legislative history. The Treasury has held that only taxes payable at manufacture, as a condition of entry into the competitive market, trigger equalization taxes, and that only equalization taxes need be covered over. More important, the Treasury reached this conclusion in a consideration of the specific gasoline tax at issue in this case. Rev. Ruling 58-554, 1958-2 C.B. 909.
 
 
 98
 Considering that these constructions are longstanding, consistent, and legally sound, we are not disposed to override them. We conclude that the cover over provision applies exclusively to those taxes laid pursuant to the equalization tax provision, 26 U.S.C. § 7652(a)(1) (1976).
 
 IV
 
 99
 Our only remaining inquiry is whether the gasoline tax revenues sought by Puerto Rico and the Virgin Islands were collected pursuant to an equalization tax. If so, Congress has directed that these funds should be covered over to the island treasuries. We find ourselves in agreement with the IRS regarding this gasoline tax, however, and hold that it does not require application of the equalization tax. Gasoline is taxed at the point of sale, not manufacture; thus, Puerto Rican and mainland manufacturers meet in the market as equals. An examination of the gasoline statute, as compared to the liquor and tobacco statutes, clearly reveals this difference and compels this result.
 
 The gasoline tax statute provides:
 
 100
 There is hereby imposed on gasoline sold by the producer or importer thereof, or by any producer of gasoline, a tax of 4 cents a gallon.
 
 
 101
 26 U.S.C. § 4081(a) (1976). The alcohol and tobacco tax statutes, which the United States has long held to require application of the equalization tax, provide in relevant part:
 
 
 102
 There is hereby imposed on all distilled spirits produced in or imported into the United States a tax at the rate of $10.50 on each proof gallon and a proportionate tax at the like rate on all fractional parts of a proof gallon ...
 
 
 103
 (c) Cross reference.-For provisions relating to the tax on shipments to the United States of taxable articles from Puerto Rico and the Virgin Islands, see section 7652.
 
 
 104
 On cigars, manufactured in or imported into the United States, there shall be imposed the following taxes ....
 
 
 105
 26 U.S.C. § 5001 (1976) (liquor tax); 26 U.S.C. § 5701 (1976) (tobacco tax). The crucial difference is immediately apparent: the gasoline tax is imposed upon gasoline "sold by the producer or importer thereof," while both the liquor and tobacco taxes are imposed upon the "manufacture" or "production" of the product.
 
 
 106
 We read the legislative history of the Foraker Act to require the imposition of an equalization tax only when a domestically laid tax has failed to reach a Puerto Rican article at the time the article enters into competition with domestic goods in the mainland market.[27] Here the Puerto Rican gasoline comes into direct competition with domestically manufactured gasoline, but, at the time they come into contact, no gasoline has yet been taxed and the Puerto Rican manufacturer has no competitive edge. The manufacturers meet as equals. Thus, one of the conditions we have postulated herein has not been fulfilled: domestic gasoline has not been subjected to a tax from which Puerto Rican gasoline remains exempt. The "protectionist" purpose of the equalization tax is not implicated.
 
 
 107
 This situation is in contrast to that which occurs when a tax is laid on the manufacture of cigars. The tax applies by its terms to cigars "manufactured in the United States" but, since Puerto Rico is not considered part of the United States for purposes of the internal revenue tax, the Puerto Rican manufacturer escapes the manufacturer's excise tax. Under these circumstances, the equalization tax provision requires that a tax equal to the domestic tax on manufacture be collected before the good enters the competitive market and undersells the domestically manufactured product. This is exactly the process by which alcohol and tobacco shipped from Puerto Rico are taxed, either in Puerto Rico or upon entry into the United States and removal from bond. See 27 C.F.R. § 250.1-250.119 (1979).
 
 
 108
 Other characteristics of the gasoline tax make this difference even more pronounced. Section 4081, read in conjunction with its definitional statutes (sections 4082 and 4083), clearly indicates that the gasoline tax is a tax on sale applied to goods while they are in the United States, not in tax-exempt Puerto Rico. In 26 U.S.C. § 4082, Congress defines "producer" to include any "refiner, compounder, blender, or wholesale distributor, and a dealer selling gasoline exclusively to producers of gasoline, as well as a producer." Congress goes on to provide that "any person to whom gasoline is sold tax-free under this subpart shall be considered the producer of such gasoline." Id. In section 4083, Congress provides that the "tax imposed by section 4081 shall not apply in the case of sales of gasoline to a producer of gasoline." 26 U.S.C. § 4083 (1976).
 
 
 109
 In other words, gasoline can change hands within the United States indefinitely, without the taxable event occurring; the tax is not levied until some producer sells to a retailer. The taxable event could be long delayed, or it could occur on the first sale after the gasoline enters the country; the point is that Congress has clearly pinpointed sale as the taxable event.
 
 
 110
 As we noted above,[28] the IRS has considered this precise question and ratified our interpretation of the gasoline tax. In an explicit consideration of the gasoline tax, as well as of the other taxes in Chapter 32 of the 1954 Code, the IRS held that the Chapter 32 taxes are levied on sale, not manufacture, and therefore need not be covered over to Puerto Rico. Rev. Ruling 58-554, 1958-2 C.B. 909. But even if Revenue Ruling 58-554 did not specifically address this question, it adopts a view of the equalization tax-as being dependent on the domestic tax at issue-that would lead us inexorably to the same conclusion. The gasoline tax simply does not require the laying of an equalization tax. Therefore, the revenues it generates certainly are not equalization tax revenues suitable for cover over.
 
 
 111
 Puerto Rico argued, and the District Court held, that the difference in language between the gasoline tax statute and the liquor and tobacco taxes (domestic taxes long held to require application of the equalization tax) is irrelevant because the taxes are all functionally identical, but we find these arguments uniformly unpersuasive. First, the argument that the statutes are identical in language, or that their "minor" semantic differences should not be deemed significant because the taxes are otherwise identical,[29] is plainly without merit. The crucial inquiry is whether the gasoline tax is laid on the act of sale or manufacture, and the gasoline tax statute states plainly that a four cent tax will be laid on gasoline "sold," while the liquor and tobacco taxes are laid on articles "manufactured." This difference may be irrelevant in other contexts, but it is certainly determinative in this instance.[30]
 
 
 112
 Any attempt to portray the gasoline statute and the tobacco and liquor statutes as functionally identical is also doomed to fail. Regardless of where the incidence of the tax falls,[31] how the tax is measured,[32] or whether the gasoline tax resembles manufacturer's excise taxes in certain other trivial respects,[33] it is indisputably true that the gasoline tax is laid on sale, while manufacturer's excise taxes such as liquor and tobacco taxes are laid on manufacture. Because the gasoline tax is laid on sale, it does not give Puerto Rican manufacturers any advantage when they bring their gasoline into the mainland market. The competitive statures of the manufacturers are equal, and no equalization tax is required.
 
 
 113
 By adopting Puerto Rico's arguments to the contrary, the District Court failed to recognize that time of taxation is the crucial inquiry, and that the gasoline statute differs from the others in this respect. As a result, the District Court erred in concluding that the gasoline tax revenues, past and future, must be covered over to the island treasuries. We reverse, and hold that the United States correctly withheld these tax revenues.
 
 V
 
 114
 To sum up, we hold that the cover over provision at issue, 26 U.S.C. § 7652(a) (3) (1976), requires that the Treasury cover over to Puerto Rico only those revenues collected pursuant to the Foraker equalization tax, 26 U.S.C. § 7652(a)(1) (1976). The gasoline tax revenues at issue were not collected pursuant to the equalization tax. Gasoline is not taxed before it enters the market; thus, Puerto Rican manufacturers obtain no competitive advantage over mainland manufacturers on account of the gasoline tax. Rather, the gasoline tax is collected at a later point, when the producer of the gasoline makes a taxable sale to a retailer. Puerto Rican and mainland gasoline, by this time mixed in the market, is taxed equally. The gasoline tax, therefore, never creates an anticompetitive situation such as that envisioned by Congress when it enacted the Foraker equalization tax and cover over provisions.
 
 
 115
 We are aware that this interpretation is complex, whereas the holding of the District Court had the advantage of simplicity, in theory if not in practice. But the legislative history of the Jones and Foraker Acts reveals Congress's intention that, as new taxes and new situations developed, the equalization tax would be imposed when necessary to equalize the competitive statuses of manufacturers. This is apparent from the open-ended language of the equalization tax provision: in it Congress did not specify which statutes by their terms would require the imposition of a residual equalization tax upon Puerto Rican goods. The Treasury, and occasionally the courts, must be prepared to examine each domestic tax statute individually, with an eye to whether the mandate of equal competition requires application of the Foraker equalization tax. As the Treasury has noted before, in Revenue Ruling 58-554, application of an equalization tax simply is not warranted in the case of gasoline.
 
 VI
 
 116
 Because we reverse the District Court holding on the merits, and hold that neither Puerto Rico nor the Virgin Islands is entitled to revenues from taxes imposed on its gasoline, we pretermit any discussion of the laches, statute of limitations, or sovereign immunity issues addressed by the District Court and by the parties in their briefs. Moreover, because we find that the cover over provision applies only to equalization taxes, and that the taxes on gasoline of Puerto Rican origin are not equalization taxes, we need not consider the Government's contention that the Highway Trust Fund, created pursuant to the Highway Revenue Act of 1956, § 209(a), 70 Stat. 374 (the Highway Fund is codified at 23 U.S.C. § 120 note (1976)), implicitly repeals the cover over provision's application to Puerto Rican gasoline. Under our interpretation, these gasoline tax revenues are not diverted from the Highway Trust Fund.
 
 
 117
 We hereby reverse the District Court grant of partial summary judgment in favor of Puerto Rico in No. 79-1020 and summary judgment in favor of the Virgin Islands in No. 79-1021, and remand with directions to enter judgment in favor of the United States.[34]
 
 
 118
 It is so ordered.
 
 
 
 *
 In this opinion, we address that portion of No. 79-1021 dealing with the covering over of revenues derived from the taxation of gasoline refined in the Virgin Islands and transported to the United States. In a companion opinion issued simultaneously herewith, we dispose of another portion of No. 79-1021, the customs duties issue unique to the Virgin Islands case
 
 
 **
 Sitting by designation pursuant to Title 28 U.S.C. § 292(a)
 
 
 [1]
 The spelling was then "Porto Rico." It was changed to "Puerto Rico" by the Joint Resolution of May 17, 1932, 47 Stat. 158 (1932). The phrase "covered into" means, literally, "deposited into." In practical terms, the provision requires the United States to rebate to the Puerto Rican treasury the same amount of funds as it collected through taxation of Puerto Rican articles in the above-described circumstances
 
 
 [2]
 In Nos. 79-1020 & 1021, the United States appeals the District Court's grant of partial summary judgment. In No. 79-1024, Puerto Rico cross-appeals the District Court's application of the doctrine of laches to prevent Puerto Rico's recovery of all taxes ever levied on Puerto Rican gasoline
 
 
 [3]
 Commonwealth of Puerto Rico v. Blumenthal, No. 75-1035 (D.D.C. Oct. 10, 1978), slip op. at 8-11
 
 
 [4]
 These include the legislative history, administrative constructions, and policies underlying the statutory language. Cf. United Steelworkers of America v. Weber, 443 U.S. 193, 200-209, 99 S.Ct. 2721, 2726-2730, 61 L.Ed.2d 450 (1979)
 
 
 [5]
 See Kananen v. Mathews, 555 F.2d 667 (8th Cir.), cert. denied, 434 U.S. 939, 98 S.Ct. 429, 54 L.Ed.2d 298 (1977) (courts have some scope for adopting a restricted rather than a literal reading of statute's words when the literal meaning would lead to absurd results); Organized Migrants in Community Action v. Brennan, 520 F.2d 1161, 1166 (D.C.Cir.1976) ("literal meaning will not be followed when it appears that to do so would, in view of the purpose of that statute, lead to an absurd or unjust result"); International Tel. & Tel. Corp. v. General Tel. & Elec. Corp., 518 F.2d 913, 921 (9th Cir. 1975) (reference to legislative history is appropriate when the statutory language is ambiguous or where a literal interpretation would thwart the overall statutory scheme)
 
 
 [6]
 If the phrase modifies "all taxes," limiting the taxes to those with the taxable event of production in Puerto Rico and transportation to the United States, then it follows logically that the cover over provision applies to Foraker Act taxes. A Foraker Act tax is laid whenever an article transported from Puerto Rico into the United States to compete with other similar goods has escaped a tax laid on similar domestic goods and will operate in the mainland market at an unfair commercial advantage absent the levying of an equal tax. Several conditions must be met, one of which is necessarily an article's production in Puerto Rico (so that it escapes a tax purely by virtue of its origin) and its transportation to the United States (so that it stands to compete with taxed domestic goods). See pp. 627-629 infra
 If, however, the phrase modifies "all taxes" only insofar as it describes a class of articles, all of the taxes on which are to be covered over into Puerto Rico, nothing in the statute on its face suggests that the gasoline tax revenues should escape cover over.
 
 
 [7]
 For a general discussion of its purposes, see H.R.Rep.No. 249, 56th Cong., 1st Sess. 16 (1900); 33 Cong.Rec. 1944, 2477 (1900)
 
 
 [8]
 Another portion of section 3 required the United States to hold revenues from certain temporary customs duties for the benefit of Puerto Rico, but only until the President of the United States issued a proclamation creating a local government and system of taxation for Puerto Rico, at which time the duties ceased. See also H.R.Rep.No. 77, 64th Cong., 1st Sess. 1-2 (1916); H.R.Rep.No. 2945, 59th Cong., 1st Sess. 2 (1906)
 
 
 [9]
 Section 14 of the Foraker Act provided that the internal revenue laws of the United States should not be applicable in Puerto Rico. As the Government noted in its brief on appeal, "The Congress believed that the excise taxes that then characterized the internal revenue system of the United States would unduly burden the people of Puerto Rico." Brief for Appellant at 23. See H.R.Rep.No. 249, 56th Cong., 1st Sess. 16 (1900)
 
 
 [10]
 We do not, however, foreclose the possibility that some tax other than a tax on manufacture exists requiring the application of a Foraker tax. We can think of no such example, but that does not mean that some future legislative enactment may not fit this description
 
 
 [11]
 The question arises whether this interpretation of the Foraker tax, as an "equalization tax," does not in fact nullify the charitable attempt to ease tax burdens on Puerto Rico through the blanket exemption in section 14. In fact, it does not. The Foraker tax does not come into play in a wide variety of situations; it applies only to taxes on articles shipped to the United States. Puerto Rican manufacturers who sell their wares locally are exempt from taxation by the United States (though still liable for taxation by Puerto Rico). Also, the Foraker Act did not lift the exemption from taxes on occupations, only from taxes on articles transported
 
 
 [12]
 The first portion of the description, "taxes that are collected under the internal-revenue laws of the United States on articles produced and used in Puerto Rico," refers to nonexistent taxes, since after section 14 of the Foraker Act was enacted, the United States did not tax Puerto Rican goods consumed in Puerto Rico. The second description, however, is an accurate description both of the Foraker equalization taxes and of their treatment
 
 
 [13]
 See Commonwealth of Puerto Rico v. Blumenthal, No. 75-1035 at 11; Brief for Appellee at 11 n.13
 
 
 [14]
 See Section III-A-1 supra, for the complete text of the original Foraker equalization tax provision
 
 
 [15]
 See Brief for Appellant at 28; Commonwealth of Puerto Rico v. Blumenthal, No. 75-1035, at 10-11
 
 
 [16]
 See 53 Cong.Rec. 7475 (1916) (remarks of Rep. Miller)
 
 
 [17]
 Foraker Act, § 14, 31 Stat. 77 (1900)
 
 
 [18]
 A large portion of the Jones Act debates was consumed with discussion of whether Puerto Ricans should be given United States citizenship, a proposition which, given the terms of the bargain, many Puerto Ricans did not support. 53 Cong.Rec. 7470-7480 (1916). In the debates, Congress seemed primarily concerned with the long-term political stability of the island. Id. The cover over provision received little attention. See 53 Cong.Rec. 7475 (1916) (Rep. Miller's brief discussion of the cover over provision)
 
 
 [19]
 Most notably, Representative Miller described the taxes collected pursuant to the Foraker Act, and their treatment prior to 1916, and then stated, "(T)hat is one of the changes made in the bill." 53 Cong.Rec. 7475 (1916). He then went on to describe the tobacco taxes upon which the framers of the Foraker tax concentrated, see 33 Cong.Rec. 1944 (1900) (remarks of Rep. Payne). Representative Miller concluded by remarking, "It is proposed in this bill that that sum of money shall go into the treasury of Porto Rico" (emphasis added)
 
 
 [20]
 The Jones Act was intended primarily to supersede those portions of the Foraker Act creating a provisional government. 53 Cong.Rec. 7470-7473 (1916). Apart from criticizing the government created by the Foraker Act, the Congressmen and Puerto Rican witnesses discussing the Jones Act had high praise for the Foraker Act reforms (such as the public school system). See 53 Cong.Rec. 7470-7475 (1916) (particularly the remarks of Mr. Rivera)
 
 
 [21]
 Zenith Radio Corp. v. United States, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). Accord, Saxbe v. Bustos, 419 U.S. 65, 75, 95 S.Ct. 272, 279, 42 L.Ed.2d 231 (1974); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). See also Gelman v. Federal Election Commission, 631 F.2d 939, 943 (D.C.Cir.1980); Kyle v. Interstate Commerce Commission, 609 F.2d 549 (D.C.Cir.1979)
 
 
 [22]
 The O'Connell letter was incorporated into the Committee Report, S.Rep.No.476, 80th Cong., 1st Sess. 5-6 (1947), and placed on record during hearings before the House Ways and Means Committee in 1948 on a bill similar to S. 1014. See Hearings on H.B. 4979 before the House Committee on Ways and Means, 80th Cong., 2d Sess. 54 (1947)
 
 
 [23]
 S. 1014 was not enacted by Congress, but seven years later Congress enacted a cover over provision that we are assuming to be identical in effect to that applying in Puerto Rico. See section II supra. Puerto Rico's argument that we should not consider the legislative history of a bill that was never enacted represents a correct statement of the law, Interstate Natural Gas Co. v. F. P. C., 156 F.2d 949, 952 (5th Cir. 1946), aff'd., 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947), but it is a principle inapplicable to the case at hand. We are examining the O'Connell letter not as legislative history of S. 1014, but as a Treasury construction of the Puerto Rico cover over provision
 
 
 [24]
 See Section III-A-1 supra
 
 
 [25]
 In Revenue Ruling 58-554, 1958-2 C.B. 909, the IRS held that application of the equalization tax provision depends not on the nature of the article but on the nature of the domestic tax laid on that article. This comports with our interpretation of the Foraker equalization tax discussed at III-A-1 supra. Since the IRS released Revenue Ruling 58-554, the Treasury has examined the applicability of the Foraker tax to Puerto Rican margarine (Doc. C-57) (App. 316) and Puerto Rican ballpoint pens (Doc. H-15) (App. 372). See our discussion of Revenue Ruling 58-554 at text accompanying note 26 infra, for an examination of other aspects of this ruling
 
 
 [26]
 See note 25 and accompanying text supra
 
 
 [27]
 See Section III-A-1 supra
 
 
 [28]
 See text accompanying note 26 supra
 
 
 [29]
 Brief for Appellee at 20
 
 
 [30]
 At any rate, the Supreme Court has mooted this argument, for purposes of the gasoline tax, by holding that the gasoline tax is levied at the point of sale to a retailer. Gurley v. Rhoden, 421 U.S. 200, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975)
 
 
 [31]
 In Gurley v. Rhoden, 421 U.S. 200, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975), the Supreme Court held that the incidence of the gasoline tax falls on the producer who makes the taxable sale to the retailer, and not on the consumer. In fact, the Treasury has promulgated regulations to this effect. 26 C.F.R. § 48.480 4081-1(c) (1979). These regulations contain within them even more evidence that the gasoline tax is levied at the point of sale: "The tax imposed by section 4081 is payable by the producer or importer making the sale of the gasoline." Id. (emphasis added)
 We feel that the question of who pays the tax is legally irrelevant. Regardless of who pays this tax (and, we emphasize, the tax may be paid by the manufacturer or any in a long line of middlemen), the tax liability arises at the point of sale. The Puerto Rican and mainland products meet in the market on equal terms, and no equalization is necessary.
 
 
 [32]
 Puerto Rico argues that the gasoline tax is really a manufacturer's excise tax because it is computed without reference to market prices at the time the gasoline is sold; rather, a flat four cents a gallon tax is laid on each gallon sold or used. Brief for Appellee at 23. This merely proves that the gasoline tax is not a retail sales tax, which has never been argued herein. It is irrelevant to the crucial question: whether gasoline coming into the United States from Puerto Rico has already escaped a domestically laid tax on manufacture
 
 
 [33]
 Two other alleged similarities deserve mention. Puerto Rico argues that the gasoline tax is not a tax on sale because it is "imposed on the entirety of gasoline produced whether sold or not." Brief for Appellee at 22. Puerto Rico alludes to the fact that the IRS, by regulation, imposes the tax upon the sale or use of the gasoline. 26 C.F.R. § 48.4082-1(c) (1979)
 This regulation, however, in no way undercuts our argument. In this regulation the IRS specifically analogizes certain types of uses to sales, and then proceeds to tax those uses as if they were sales. This only underscores our reading of the gasoline statute as a tax triggered by sale, not by manufacture.
 The final argument worth considering is Puerto Rico's contention that the tax liabilities for these three statutes actually occur at the same time. This is simply untrue. Liquor and tobacco are taxed in Puerto Rico before their shipment to the United States, or taxed upon release from warehouse or bond. 27 C.F.R. § 250.1-250.119 (1979). The regulations controlling this process are extremely complex. They include provisions for deferred payment of tax, and it is probably this provision upon which Puerto Rico bases its claim. But the difference is illusory. Regardless of when the manufacturer of liquor and tobacco actually pays the tax, the tax liability occurs when the articles leave the manufacturer's control and enter into the mainland market. Because of the tax liability, the competitive positions of the mainland and Puerto Rican manufacturers are equalized; without it, the mainland manufacturer would carry an unfair tax burden.
 The gasoline tax, on the other hand, is not levied until the time of taxable sale. This may occur immediately after the gasoline enters the United States, or it may occur much later, after the gasoline has passed through the hands of several middlemen producers. The point is that the gasoline has entered the mainland market on equal terms with mainland-manufactured gasoline. For all of Puerto Rico's arguments to the contrary, the difference could hardly be clearer.
 
 
 [34]
 Shortly after the District Court decisions in the Puerto Rico and Virgin Islands cases, the United States moved in this court for a stay pending appeal. A motions panel of this court denied the motion, instead ordering the United States Treasury to deposit into an interest-bearing escrow account the revenues at issue in these suits. This account was to be maintained, and revenues and interest accumulated, from the time of the District Court orders until one of two events occurred: 1) the institution of a formal cover over policy following an affirmance on the merits, or 2) a final appellate decision reversing the District Court
 On July 23, 1979, the United States moved in this court to modify the orders to eliminate the requirements for payment of interest, and it also requested that this court consider the motion concurrently with a decision on the merits. Because we reverse the District Court judgment and hold that none of these revenues need be covered over, the first stay orders will expire by their own terms when our decision becomes final, and the subsequent motion to modify will be mooted.